IN THE CIRCUIT COURT OF COLE COUNTY, MISSOURI

| | |
|---|---|
| STATE OF MISSOURI, | |
| Plaintiff, | **EXHIBIT C** |
| v. | Case No. 24AC-CR00882-01 |
| BRYANNE M. BRADSHAW, | |
| Defendant. | |

## DEFENDANT'S MOTION TO SUPPRESS AND SUPPORTING MEMORANDUM

Defendant Bryanne M. Bradshaw, a former public employee, respectfully moves the Court for an order suppressing and excluding from trial and disposition the entirety of statements she made to (1) investigators with her then-employer, the Missouri Department of Corrections (DOC) during an internal investigation of the death of inmate ▇▇▇▇▇▇▇▇; and (2) Cole County Sheriff's Department investigators during the prosecutor's criminal investigation into ▇▇▇▇▇ death.

Bradshaw's statements were obtained under direct threat of her employment being terminated and thus were compelled within the meaning of the Fifth Amendment, the Fourteenth Amendment Due Process Clause, the Missouri Constitution, and *Garrity v. New Jersey*, 385 U.S. 493 (1967). The Constitution prohibits the use of coerced statements like these in a criminal case, including specifically when the coercion is based on economic considerations:

> Our question is whether a State, contrary to the requirement of the Fourteenth Amendment, can use the threat of discharge to secure incriminatory evidence against an employee…We conclude that policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights. There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price. Engaging in interstate commerce is one.

*Garrity,* 385 U.S. at 499.

1

Fundamental fairness dictates Bradshaw's statements should be deemed inadmissible in the § 1983 civil action currently pending in the United States District Court of the Western District of Missouri, Southern Division, brought by ▇▇▇ mother and sister for money damages. This suppression motion is or will be submitted to the Court in the civil lawsuit.

Bradshaw's statements to investigators were not voluntary and were extracted only after she was warned that refusing to answer questions would result in her firing. Under *Garrity* and its progeny, Bradshaw's statements are tainted by compulsion and carry an implied immunity from being used against her. The State thus has filed the underlying charges based on tainted, inadmissible evidence. By extension, the Plaintiffs in the civil suit seek to exploit the evidence in the discovery process, including for later use as impeachment or as direct evidence.

All of these results effectively circumvent Bradshaw's Fifth Amendment privilege and reward the very coercion that *Garrity* guards against. The Court should suppress Bradshaw's compelled statements.

**TIMELINE OF THE STATEMENTS SUBJECT TO THIS MOTION**

**December 8, 2023–Incident and Resulting Events:** On the morning of Dec. 8, 2023, inmate ▇▇▇ died following a use-of-force incident at Jefferson City Correctional Center (JCCC). Bradshaw was employed as a corrections officer at JCCC and was present during certain of the events surrounding ▇▇▇ death (as detailed in prior filings in this proceeding). Shortly after the incident (on information and belief through a directive sent by email), the JCCC Warden directed some or all DOC employees involved (including Bradshaw) to fully cooperate with the investigation into ▇▇▇ death. The directive made clear that failure to cooperate or to answer questions would result in a non-cooperating employee's discharge.

2

Bradshaw was given a stark choice: either talk to investigators or lose her job. And the Warden gave her a date/time for the mandatory interview with law enforcement.

**January 3, 2024–Cole County Sheriff's Interview:** The Cole County Sheriff's Department (CCSD) began a criminal investigation into Moore's death. In January 2024, CCSD detectives scheduled interviews with the DOC employees having knowledge of the events leading to the incident. Bradshaw did not schedule her own interview with CCSD. Rather, the directive from the JCCC Warden told Bradshaw to sit for the interview at a predetermined a date/time. Bradshaw had no hand in the decision to give the interview or its arrangement. The directive Bradshaw received specifically encompassed cooperation with "outside law enforcement" agencies, meaning Bradshaw understood she *must* speak to the CCSD or lose her job.

On the day of her CCSD interview, Bradshaw appeared (not in custody, but certainly under compulsion) and spoke with the CCSD. Bradshaw was presented with a Miranda Warning and signed a waiver. However, Bradshaw believed (as would anyone) that invoking her rights or refusing to participate would result in the immediate termination of her employment. The setting was inherently coercive because the DOC expected full participation from Bradshaw on pain of losing her job.

Bradshaw, without personal legal counsel present, answered questions by the CCSD. She understood (as any reasonable employee would) that *refusing* to answer a law enforcement officer, after being explicitly told by the JCCC Warden to cooperate with outside law enforcement and attending pre-arranged interview, would lead to her firing. Bradshaw provided information about ▓▓▓▓▓ behavior, the corrections officers' responses, and her role (which she portrayed as following orders and assisting in restraint, not delivering any blows or making any critical decisions independently).

3

At the conclusion of this interview, Bradshaw was allowed to leave–she was not arrested on the spot–reinforcing that the primary purpose of the interview was information-gathering. It was only later, after further investigation, that prosecutors decided to bring charges against Bradshaw.

**January 11, 2024–DOC Internal Affairs Interview:** The DOC's Office of Professional Standards, likely the Employee Conduct Unit, commenced an internal review of the events involved in ▇▇▇ death. On or about January 11, 2024, one or more OPS investigators interviewed Bradshaw about the incident.

Bradshaw knew that DOC's directive and standard operating procedure required her to answer all questions posed by Internal Affairs. She was *not* given any *Miranda* warning (nor was one required, as this was an internal administrative inquiry and she was not in police custody). Bradshaw was *not* explicitly told by the OPS investigators that her statements would be immune from criminal use (often referred to as a "Garrity warning"); instead, the context implicitly indicated she had to comply or face discharge.

Feeling she had no choice, Bradshaw answered the DOC investigators' questions. During the recorded interview (the specifics of which are in DOC's investigative file), Bradshaw recounted the sequence of events: how ▇▇▇ had been disruptive during a cell search, how force (pepper spray) was used when he resisted, how he was placed in restraints and a spit hood, and how she and others left him secured in a cell. Bradshaw also described her own limited involvement in the events—helping to escort ▇▇▇ and observing his condition.

Bradshaw's statements to OPS were entirely compelled; she spoke under the direct threat that her silence equaled discharge. At no point did Bradshaw freely volunteer information; every answer was given under economic and professional coercion from her employer.

4

Case 2:24-cv-04107-MDH    Document 117-3    Filed 05/01/25    Page 4 of 15

**June 28, 2024–Criminal Indictment References Statements:** When Bradshaw (and others) were indicted in June 2024, the Probable Cause Statement supporting the indictment against Bradshaw referenced her statements from the interviews. The indictment noted (paraphrasing) that "CO Bradshaw acknowledged seeing that ▓▓▓▓ was having trouble breathing but did not intervene" (a point Bradshaw contests as inaccurately transcribed).

The inclusion of Bradshaw's compelled admissions in the indictment underscores at least two problems: (1) the State has treated her statements as evidence, and (2) those statements are incriminating enough that Plaintiffs are eager to use them in their civil case against Bradshaw and a host of other individual and corporate Defendants. Indeed, Plaintiffs have obtained the transcripts or summaries of Bradshaw's interviews (produced in discovery or via investigative records) and have indicated they form a key part of their case. Plaintiffs have argued to the federal court that the statements were made in a voluntary waiver of Bradshaw's constitutional rights: the existence of a "deliberate, knowing, and intentional decision" by Bradshaw to waive Fifth Amendment privileges against self-incrimination.

At both critical junctures when Bradshaw gave information–to the DOC and to CCSD–she did so under threat of discharge from her job. Bradshaw was a public employee compelled to answer employer and law enforcement questions or lose her employment. These facts trigger the protections of *Garrity* and the constitutional principles on which it is based.

## ARGUMENT

A suppression motion serves as a critical safeguard against unlawful government overreach, ensuring that evidence obtained through unconstitutional means—whether through unlawful searches, coerced confessions, or violations of a defendant's rights—is kept out of the courtroom. It is a powerful tool to protect the integrity of the justice system, demanding that the

State respect the constitutional rights of every individual. When granted, suppression stands as a firm reminder that the ends do not justify the means, and that justice cannot be built on unlawful actions.

**I.      Bradshaw's Statements were Compelled and are Inadmissible as a Matter of Well-Settled Law under *Garrity v. New Jersey*, the Fifth Amendment, the Fourteenth Amendment Due Process Clause, and the Missouri Constitution.**

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." This privilege against self-incrimination applies not only in criminal trials, but also in any proceeding where the government seeks to compel incriminating testimony. *Garrity* established vital protection for public employees: when a government employer gives an employee a choice between self-incrimination and job loss, and the employee incriminates herself, those statements are considered coerced and cannot be used against the employee in a subsequent criminal prosecution.

*Garrity* found the police officers' statements "were not voluntary but were coerced" because of the economic threat to their livelihood from job loss, and the Supreme Court reversed their convictions. The *Garrity* rule ensures that the government cannot sidestep the Fifth Amendment by using a public employer's power to punish silence through an adverse employment action towards an at-will public employee like Bradshaw. *See American Federation of State, County and Municipal Employees AFL-CIO, Council 61 v. State,* 653 S.W.3d 111, 116 (Mo. banc. 2022) (because the merit system is not in force for public employees in Missouri, "the scope and definition of at-will employment provide for indefinite duration *and termination without cause…*") (emphasis added). Although *Garrity* itself dealt with the use of statements in a criminal

6

proceeding, its logic extends to any forum where the government (or a proxy for the government) would seek to use the fruits of that compulsion to penalize the individual.[1]

The facts here fall within the scope of the *Garrity* ruling:

- **There was a threat of termination**: DOC explicitly directed its employees (including Bradshaw) to cooperate and answer questions by outside law enforcement—the corrections officers were not asked about their willingness or given a choice whether to sit for, in Bradshaw's case, the pre-arranged interview with the CCSD. This is exactly the predicament in *Garrity*, where officers were warned that refusal to answer would result in removal from office. The coercion here was codified in an email and backed by Missouri law that public employees can be terminated for refusing to answer job-related questions (so long as they are not forced to surrender immunity). Bradshaw's "choice" was cooperate or lose her public career–a choice the Constitution says she should not be forced to make without immunity.

- **Bradshaw's statements were incriminating**: At the time she gave them, it was reasonably foreseeable that Bradshaw's admissions could be used in a criminal prosecution for ▆▆▆▆ death. The investigators were gathering evidence of possible crimes (as shown by the eventual charges). Under *Minnesota v. Murphy*, 465 U.S. 420 (1984), the test is whether a reasonable person would believe the answers could be used to incriminate, and whether the answers were in fact compelled. Here, a reasonable person would see the

---

[1] The civil lawsuit, while initiated by private plaintiffs, functionally stands in the shoes of the decedent's rights and seeks to hold Bradshaw accountable as a state actor. Allowing Plaintiffs to use Bradshaw's compelled statements would effectively allow the government to benefit from its coercion, imposing civil liability with those statements when it could not impose criminal liability directly with the same evidence. Such use would be fundamentally unfair and inconsistent with the spirit of the Fifth Amendment and *Garrity*.

7

Case 2:24-cv-04107-MDH    Document 117-3    Filed 05/01/25    Page 7 of 15

subject of the interview was a man's death and that Bradshaw's answers could implicate her in wrongdoing.

- **<u>No immunity was granted at the time of questioning</u>**: In *Garrity*, New Jersey had no statute granting immunity, and none was offered to the officers who gave statements, so their statements were used against them–an outcome the Supreme Court forbade. Bradshaw was never told her statements would be immune from prosecution. The DOC did not provide a so-called "Kalkines" warning (the federal equivalent where an employee is ordered to answer but given use immunity). Bradshaw was simply told to answer–period.

This is the very scenario in which *Garrity* automatically confers "use immunity" as a matter of constitutional law: because the state compelled Bradshaw's statements without immunizing her, the Fifth Amendment itself prohibits their use in any criminal case against her. Missouri courts will have to honor that if the case goes to trial–they cannot use her compelled internal or CCSD interview statements in the criminal trial (and presumably they will be suppressed).

**Implications in the Civil Case**

While the literal text of the Fifth Amendment refers to a "criminal case," courts have long recognized that coerced confessions are inadmissible not only in criminal trials but generally elsewhere—because of their inherent unreliability and the public policy against compulsion. For instance, a confession obtained in violation of due process (through physical coercion) is inadmissible in any proceeding, as it offends fundamental fairness. The coercion here was of a different kind–economic coercion–but it nevertheless implicates the same Fifth Amendment concerns.

8

Allowing the use of *Garrity*-protected statements in a civil case would create an end-run around the Fifth Amendment. State Prosecutors could simply wait for civil discovery to get what they could not directly compel. Plaintiffs in a Section 1983 action (who often work closely with underlying criminal investigations) could serve as the conduit for introducing tainted statements.

This Court should not countenance such circumvention. This is especially true where, as here, the party seeking to use the statements is effectively availing themselves of government action (the investigation) to bolster their case. This very issue is being litigated in tandem for not only Bradshaw, but certain of her co-Defendants in the civil matter.

The Eighth Circuit has not squarely decided in a published opinion whether *Garrity*-compelled statements must be excluded from a related civil proceeding. However, even absent direct authority, the principles are clear: Bradshaw's statements were involuntary in the constitutional sense. The Supreme Court has consistently held that statements deemed involuntary (whether from physical abuse, psychological ploys, or impermissible threats) are inadmissible for any purpose in criminal cases–even impeachment. *New Jersey v. Portash* held that grand jury testimony given under a promise of immunity, hence compelled, could not be used to impeach the defendant at trial because coerced statements are inadmissible. 440 U.S. 450 (1979).

By analogy, *Garrity* statements, which are effectively immunized by the Fifth Amendment, cannot be used for impeachment or to challenge credibility in a criminal trial. It follows that if Bradshaw were to testify in the civil federal case, Plaintiffs should not be allowed to confront her with inconsistencies from her *Garrity* statement or otherwise use it to attack her–doing so would be using coerced material to impose liability.

This Court has the supervisory power to ensure the proceedings herein are fair and in accordance with constitutional norms. Suppressing the statements serves those ends. *Garrity*

9

rights are part and parcel of the Fifth Amendment privilege. When Bradshaw answered the investigators, she did so only because she was effectively told, "You will not (at least by operation of law) be prosecuted with these answers, but you must answer or be fired." The State chose to compel answers without formally granting immunity, but the Constitution will step in to supply that protection.

Bradshaw's position thus is now analogous to having testified under a grant of immunity. Courts uniformly forbid using immunized testimony against a witness in later proceedings, even civil ones, if the immunity order so specifies (federal use immunity under 18 U.S.C. § 6002 prohibits any use, direct or indirect, of compelled testimony in any prosecution). While § 6002 does not directly govern here, the principle of immunized testimony helps inform the equitable result. The government (or its proxies) cannot have its cake and eat it too–it cannot force out testimony by threatening one penalty (job loss), thereby implicitly immunizing the testimony, and then turn around and assist another litigant in using that testimony to impose a different penalty (civil money damages).

The Court should suppress Bradshaw's statements because of their compelled nature. Use of these statements would violate the Fourteenth Amendment's due process clause, which has been interpreted to forbid government exploitation of coerced statements to secure a conviction or other deprivation. For instance, in *Spevack v. Klein*, the Supreme Court held that a lawyer could not be disbarred (a civil consequence) for invoking the Fifth Amendment, reinforcing that punitive sanctions cannot be applied for exercising or being forced to waive the privilege. 385 U.S. 511 (1967).

By similar reasoning, Bradshaw should not suffer a civil judgment based in any part on statements she was compelled to give. It would offend "a sense of justice" to allow such a result

(to borrow from *Rochin v. California*'s famous phrase for due process violations). At the very least, serious constitutional questions would be raised by allowing the statements into evidence–questions this Court can avoid by simply suppressing them.

## II. Bradshaw Did Not Voluntarily Waive Any Fifth Amendment Rights, and the State's Anticipated Arguments of Waiver or Consent Cannot be Established.

The State may argue that Bradshaw waived her Fifth Amendment privilege by speaking with investigators and thus any protection is lost. Such a position is misplaced legally and factually. A waiver of the Fifth Amendment privilege must be an intentional relinquishment of a known right, done freely. Bradshaw's speech was compelled, not free, and she certainly did not intend to surrender her privilege–quite the opposite, she could believe (rightly) that by being forced to speak under threat of economic compulsion, the law would not allow those statements to be used against her.

There was no "knowing" waiver. Bradshaw was never confronted with a situation where she could consult counsel and make a strategic decision to waive her rights. Instead, she was put on the spot by authority figures in a context far removed from a courtroom. The Supreme Court in *Gardner v. Broderick* held that a public employer cannot compel an employee to waive the Fifth Amendment on pain of dismissal; if the employee refuses to waive immunity, the employer can fire them for not answering *only* if immunity is granted. 392 U.S. 273 (1968).

By implication, if an employee *does* answer under that threat, it is not a true waiver of immunity–it is a coerced surrender. That is what happened to Bradshaw.

The State may rely on *Mitchell v. United States*, but it is distinguishable. 526 U.S. 314 (1999). Unlike there, Bradshaw did not voluntarily testify in a legal proceeding or voluntarily speak without coercion. *Mitchell* supports the requested outcome here: partial invocations (and the grey area they represent) are problematic. Being forced to disclose what is asked and not to

voluntarily provide information should not strip Bradshaw of the privilege as to everything. *Murphy* explicitly holds that if a probationer is directly told to answer or face revocation, then those answers would be compelled. *Murphy*, 465 U.S. at 435. Bradshaw's answers are thus treated as compelled (hence privileged) and not as a waiver.

Any argument by the State that "she talked, so we can use it" must fail. The proper lens is "she talked *because she was forced*, so you cannot use it."

### III. Use of Bradshaw's Coerced Statements Would Violate Due Process and Undermine the Truth-Seeking Function.

Alternatively, the Court should exclude Bradshaw's statements under general due process principles. Having been made under duress, the statements carry inherent indicia of unreliability. When a person is compelled to speak under threat of job loss, the human temptation inevitably exists to appease both masters–telling investigators something to satisfy them and protecting the employee from discipline. The circumstances of the Bradshaw interviews were far from a calm, voluntary truth-telling session. *Compelled statements are not guaranteed to be truthful statements*.

*Garrity* acknowledged this principle, noting the inherent scrutiny that coerced confessions deserve. That is one reason they are barred–not only to protect the defendant's will, but to ensure the reliability of evidence. If this case were to proceed with Bradshaw's statements in evidence, the State would have to litigate what she actually said, what she meant, and whether it was true–a sideshow that complicates the proceeding.

Alternatively, if Bradshaw's statements are taken at face value (as the State will surely present them), it could mislead the jury into thinking "even she admitted X, Y, Z." In reality, any such "admission" was wrung out of her through the threat of a job loss, and may not be a full or accurate depiction. Excluding the statements avoids confusing the issues and undue prejudice.

## CONCLUSION

Bradshaw asks that **all portions** of her compelled interviews–whether recorded, transcribed, summarized, or testified to by others–be suppressed and deemed inadmissible against her in this case. This includes:

- **Her CCSD interview** (January 3, 2024, including any audio recording, transcript, or detective's summary of her statements).

- **Her DOC internal investigative interview** (January 11,2024 and any written reports or notes of what she said).

- **Any statements derived from those compelled interviews.** For example, if Bradshaw's compelled statement led investigators to certain evidence or to question others in a specific way that produced other statements, they have become direct poisoned fruit and their reliability is suspect. (the State can still use evidence gathered independently; the relief herein seeks to exclude derivative evidence if it is uniquely the product of Bradshaw' statements and would not have been found but for them. However, since multiple officers gave statements and there is video, most evidence exists apart from Bradshaw's words.)

- **No use for impeachment**. If Bradshaw testifies at trial, the State should not be permitted to confront her with inconsistencies between her trial testimony and her compelled statements. Normally, prior inconsistent statements are fair game to challenge credibility, but here the prior statement is constitutionally tainted. The rule from *James v. Illinois*, 493 U.S. 307 (1990), barring use of illegally obtained evidence to impeach defense witnesses and *New Jersey v. Portash* (barring use of immunized grand jury testimony to impeach defendant) should apply by extension. 440 U.S. 450 (1979). The deterrent and protective

purposes of *Garrity* would be undone if the statements could be wheeled in for impeachment whenever convenient.

By suppressing the statements for **all purposes**, the Court draws a bright line that protects Bradshaw's rights and simplifies the proceedings.

## EXPRESS RELIEF SOUGHT

Bryanne M. Bradshaw respectfully requests that this Court **suppress and exclude from evidence** her compelled statements to DOC and CCSD investigators regarding the December 8, 2023 incident and ▮▮▮▮▮ death. Specifically, we ask for an Order providing that:

- State may not introduce or refer to Bradshaw's internal investigative interview statements or her statements to the Sheriff's Department in any manner in the trial of this case (whether in their case-in-chief, cross-examination, or rebuttal).

- State may not use those statements to formulate or support any argument for conviction.

- Any information derived solely from Bradshaw's compelled statements that was not obtained independently should likewise be excluded (to be identified with specificity if any is at issue).

Accordingly, Defendant Bradshaw prays that the Motion to Suppress be **GRANTED in full**.

Respectfully submitted,

ENG & WOODS

/s/Adam Dowling
Adam Dowling
Missouri Bar No. 58907
1000 W. Nifong Boulevard
Building 7, Suite 201 Columbia, MO 65203
Phone: 573-874-4190
Fax: 573-874-4192
ADowling@EngandWoods.com
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2025, I electronically filed this pleading with the Clerk of the Court using the e-filing system which will send notification of such filing to all attorneys of record.

/s/Adam Dowling
**Attorney for Defendant**