IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

DORIS ANN SCOTT and ORIEL MOORE,

    Plaintiffs,

v.

TREVOR FOLEY, in his official and individual capacity as DIRECTOR of the MISSOURI DEPARTMENT OF CORRECTIONS, et al.,

    Defendants.

Case No. 2:24-cv-04107-MDH

**REPLY IN SUPPORT OF CERTAIN DEFENDANTS'
MOTION FOR RECONSIDERATION (DKT. 116-117)**

As three young corrections officers early into their careers, the Moving Defendants[1] did not simply "choose" to cooperate with investigative authorities after receiving an email from the warden of the facility where Othel Moore died. The email, *considered in the context in which it was sent*, compelled them to allow the interrogations within the meaning of *Garrity v. New Jersey,* 385 U.S. 493 (1967). Forced to by the circumstances below, the Moving Defendants read the email as requiring a choice between compliance or job loss. Under *Garrity*, the government cannot use the threat of discharge to secure incriminatory evidence against a public employee. *Garrity* safeguards against the damned-if-you-do, damned-if-you-don't Constitutional problem now faced by the Moving Defendants.

Application of *Garrity* does not hinge on semantics, and neither should this Court's decision whether the Moving Defendants waived their Fifth Amendment rights. The email did not have to say "or you're fired" to be coercive under the law. While trivializing the email as

---

[1] Bryanne Bradshaw, Jacob Case, and Justin Leggins (the "Moving Defendants"). In December 2023, the month of the subject incident, Defendant Bradshaw was 24 years old, Defendant Case was 31, and Defendant Leggins was 34.

1

ordinary, everyday "employment guidance," neither Plaintiff holds herself out as having been a corrections officer, as having been employed by the Missouri Department of Corrections ("DOC"), or as having been present at the prison following the death of Othel Moore. Neither Plaintiff lived the experience.

To the Moving Defendants who lived the experience, refusing to answer questions by Cole County and the DOC internal investigators was not an option unless they were willing to be fired. When the email came to the Moving Defendants, the Jefferson City Correctional Center ("JCCC") was in the tense aftermath of an inmate's death. The prison was at times in lockdown, and corrections officers—many, like here, young and early in their careers—were being summoned to give statements to investigators under threat of losing their jobs.

At the center of it all was former Warden Doris Falkenrath, no longer employed by the DOC. An urgent directive issued from Warden Falkenrath–the highest authority in the prison– instructing full cooperation. Officers were not asked if they wanted to talk; they were given dates and times. To flout the Warden's authority in ordinary circumstances was insubordination. In these charged times, it was grounds for termination. Each of the unrebutted Affidavits submitted with the Moving Defendants' reconsideration motion bears this out.

The Moving Defendants were being compelled to speak because Warden Falkenrath had refused entry to the Cole County investigators when they came to the facility to investigate Othel Moore's death, creating a perception that the DOC was not willing to cooperate in the investigation. To counter this perception, the DOC (through Warden Falkenrath) directed the Moving Defendants to cooperate on threat of job loss. The perception of non-cooperation came to exist on or about December 15, 2023, when Cole County Sheriff Officers Henson, Roberts, and Marsey tried to conduct inmate and staff interviews at JCCC, but Warden Falkenrath refused

them entry:

> Upon our arrival at the facility we were greeted at the security screening area by the facility warden, Doris Falconrath. Warden Falconrath ascertained that we were the same detectives that came to the facility on 12-12-2023 and retrieved the restraint wrap chair, video and policies regarding the incident. *Warden Falconrath stated she could not let us in the facility to continue the investigation until she had "cleared it through legal'. I then asked if it would be permissible to interview the inmate witnesses to which she again replied that the requests would have to be cleared through their legal department.*

(Ex. A hereto, Field Report Narrative, emphasis added) Warden Falkenrath was later interrogated for the situation: "I asked Falkenrath to think back to when myself and two other Detectives arrived at the prison to interview offenders who were in the area, *and she turned us away*...She told me she remembers that happening. I asked what her thought process was behind doing that." (Ex. B, Falkenrath interview, p. 5, emphasis added)

Three days before turning the Cole County Sheriff's Officers away, Warden Falkenrath wrote JCCC employees in a manner that later also came to be investigated. (Ex. C hereto) Warden Falkenrath spoke of "people running their mouths," "rumors and wild stories," "imaginative details," and "the rumor mill the offenders are trying to create." (Ex. C hereto)

Through decisions and communications like these, Warden Falkenrath caused the DOC to come under scrutiny for the perception of failing to cooperate with the investigation. According to media reports, Warden Falkenrath's employment was terminated in connection with the death of Othel Moore: "[a]lso included in the lawsuit is the former warden of the prison, Doris Falkenrath, who was terminated in June before Cole County prosecutors charged the rank-and-file officers." (*Corrections1*)[2]

The DOC sought to correct the perceived lack of cooperation, hence the later mandate

---

[2] "After inmate death, lawmaker calls for more oversight of Mo. prison system," corrections1.com. Missouri Independent–*"Warden of Missouri prison replaced after investigation of inmate death"* (June 17, 2024), missouriindependent.com.

from Warden Falkenrath to the Moving Defendant to cooperate or lose their jobs. By June 2024, the DOC had made the following announcement of its cooperation with both the external and internal investigations of Othel Moore's death:

> The Missouri Department of Corrections has cooperated with outside law enforcement throughout the investigation, beginning with the reporting of Moore's death, and will continue to cooperate. In addition, the department previously conducted a separate internal investigation. As a result of the two investigations, ten people involved in the incident are no longer employed by the department or its contractors.[3]

The Moving Defendants were among "the 10 people involved in the incident" because, without legal guidance and in the context of these circumstances, Defendants responded to what they believed were mandatory inquiries to assist an internal investigation by the DOC and an outside investigation by Cole County, unaware the statements might later be weaponized in a federal civil rights suit in the context of being charged with murder. This is *Garrity* compulsion in its clearest form. The email directing the Moving Defendants to allow interrogation was not just a departmental update or "guidance." It was a directive issued within a culture of command, enforced by examples, including Warden Falkenrath.

Plaintiff's benign characterization of the email is contradictory when they have alleged "[u]nder MODOC's directive, a systematic practice of fear-mongering, infliction of pain, and intimidation tactics has been used against inmates, defining a culture of cruelty which is explicitly forbidden by the Eighth Amendment as cruel and unusual punishment." (Amended Complaint, Dkt. 112, p. 19, ¶ 92) Plaintiffs should be held to apply their theory to rank-and-file staff. Plaintiffs cannot take a position suggesting systemic pressure for inmates but not for the

---

[3] "Statement Regarding the Investigation into the Death of Othel Moore": https://doc.mo.gov/media-center/newsroom/moore-investigation#:~:text=The%20Missouri%20Department%20of%20Corrections,the%20department%20or%20its%20contractors

4

correctional officers operating under the same alleged cultural problems.

## ARGUMENT

Plaintiffs devote much of their Opposition to procedural broadsides, arguing that Fed. R. Civ. P. 54(b) relief is categorically unavailable to the Moving Defendants. It may be Plaintiffs' philosophy that when the facts are against you, argue procedure. When it comes to Constitutional rights, however, it should be the facts that dominate over procedural considerations. The facts here compel a finding that the Moving Defendants did not waive their Fifth Amendment privileges. What matters for Fed. R. Civ. P. 54(b) is that the Court is now presented with a more complete record. 11 Wright & Miller, Fed. Prac. & Proc. § 2857 (2d ed.) (the power to revisit interlocutory orders exists so that a court can "afford such relief from them as justice requires."). The Moving Defendants ask this Court to reconsider the stay denial for any one of the following compelling reasons.

### I. THE EMAIL WAS A MANDATE—NOT ORDINARY "GUIDANCE" FROM AN EMPLOYER TO AN EMPLOYEE.

According to Plaintiffs, the Department's December 26, 2023 email was an innocuous suggestion. This cannot be squared with what actually occurred. The Warden's message announced pre-scheduled interrogations by the Cole County Sheriff's Department and directed staff to attend–a command from the very top of the JCCC chain of authority. Missouri courts recognize that forcing public employees to choose between self-incrimination and unemployment violates the Constitution. *See State v. Von Behren*, 799 S.W.2d 806, 809–10 (Mo. App. 1990) (applying *Garrity* to suppress statements obtained under threat of termination).

Plaintiffs' insinuation that *Garrity* protection vanishes in an "at-will employment" jurisdiction has no support in the law. Plaintiffs cite no authority–none–that public officials lose their Fifth Amendment rights simply because their jobs lack civil-service tenure. *Garrity* itself

5

involved police officers, who certainly were not guaranteed lifelong employment.

What matters is not based on nuances of Missouri employment law, but whether the State imposed a coercive choice on its employees. The DOC did exactly that, implicitly invoking its power to fire at will as a cudgel. The lack of a formal statute or procedural rule spelling out "talk or be fired" is irrelevant when the *actual message conveyed* was exactly that. *Garrity* and its progeny protect *all* public employees from being forced to surrender one constitutional right to keep another, regardless of their employment status.

Plaintiffs also contend Defendants ultimately received Miranda warnings and signed waivers before speaking to the Sheriff's investigators. This misconstrues *Garrity*. A public employee's statements cannot be deemed "voluntary" if the employee was compelled to give them under threat of job loss. A Miranda waiver obtained under the threat of termination is no waiver at all. Defendants were not free in their decisions—they were cornered. The unrebutted Affidavits attest that the *only* reason the Moving Defendants signed the Miranda form was a belief–based on Warden Falkenrath's directive–that refusing to sign and talk would get her fired. The publicized termination of Warden Falkenrath (removed from her post amid the Moore investigation) made clear that non-cooperation was a terminable offense.

The presence of a Miranda warning in this context is thus a red herring. *Garrity* is a shield for those who speak because they have no free choice. The Moving Defendants have established in unrebutted Affidavits that they spoke on fear of losing their livelihood. *Garrity* is their shield.

## II. PLAINTIFFS' RELIANCE ON *MINNESOTA v. MURPHY* AND *UNITED STATES v. GOODPASTER* IS MISPLACED.

Plaintiffs lean heavily on *Minnesota v. Murphy* to argue the Moving Defendants' Fifth Amendment privilege was "not self-executing." 465 U.S. 420 (1984). The Moving Defendants

6

never contended it was. Murphy's facts and holding are inapplicable here for other reasons. In *Murphy*, a probationer was obliged to be truthful with his probation officer, yet the Supreme Court found no compulsion because no penalty was attached to asserting the Fifth Amendment privilege in that setting. *Murphy* reaffirmed that the equation changes if the government affirmatively imposes a substantial penalty for silence. The "penalty situation" that was absent in Murphy was very much present here. A *Garrity*-compelled employee's failure to utter "I plead the Fifth" in the moment does not somehow constitutionally launder the compulsion. *Garrity*, 385 U.S. at 499–500 (employees who answered questions after being threatened with job loss were deemed to have been compelled, even though they did not refuse to answer).

*United States v. Goodpaster* underscores why relief is merited. In *Goodpaster*, a postal supervisor was questioned by federal agents at work and *did* receive Miranda warnings, but a USPS regulation required employee cooperation in investigations on pain of discipline. 65 F. Supp.3d 1016, 1021–22 (D. Or. 2014). The employee was in a "classic penalty situation," despite his Miranda waiver. The employer had taken the "extra, impermissible step" of threatening substantial punishment (termination) if he remained silent. That threat transformed what might appear voluntary into *compelled* testimony. *Id*. at 1027. *Goodpaster* thus reaffirms that an employee's "free choice" cannot be overridden by fear of sanction. That the employer's directive here came in an email rather than the employee handbook is a distinction without a difference. In practice, the directive "fully cooperate or else" carried the same weight as any codified rule. *Garrity* can be triggered by implicit or contextual threats. *See Goodpaster,* 65 F. Supp.3d at 1029–33 (considering both formal policies and the overall context to find compulsion).

Nothing about the Moving Defendants' fear of termination was hypothetical. It was

7

grounded in the very real actions and communications of their employer. By the time the Moving Defendants were being Mirandized and questioned by law enforcement, they had already been effectively told by their employer *"participate in this investigation or find a new job."*

Plaintiffs also rely heavily on a handful of Supreme Court and lower court precedents to support their contention that the Moving Defendants waived the Fifth Amendment privilege and that no coercion occurred. Each is distinguishable—legally and/or factually. Cases like *Rogers*, *Brown*, and *Mitchell* deal with voluntary testimony in formal proceedings—not with compelled statements made in a non-adversarial setting under penalty of job loss.

Plaintiffs point to the fact that only Defendant Bradshaw has moved to suppress her statements in her criminal case, implying that the others' "failure" to do so "speaks volumes" about the genuineness of their Fifth Amendment concerns. This borders on disingenuous. That Defendants Leggins and Case have not yet filed motions to suppress in their respective criminal cases is legally irrelevant to the constitutional analysis before this Court. Criminal defense strategy is not one-size-fits-all, and the timing of suppression motions often depends on procedural posture, evidentiary development, and tactical considerations specific to each defendant. What matters here is the factual predicate: all three Moving Defendants—Bradshaw, Leggins, and Case—gave statements under the same institutional pressure, in the same climate of coercion, under the same threat of job loss.

Even if others have not yet pursued relief Bradshaw has, it would not somehow erase the compulsion under which all their statements were taken.

### III. TO PREVENT MANIFEST INJUSTICE, THE COURT SHOULD EXERCISE ITS DISCRETION TO RECONSIDER ITS PRIOR STAY DENIAL.

Fed. R. Civ. P. 54(b) likely is the proper standard because the order denying a stay was interlocutory (not a final judgment). Under the Rule, District Courts have "inherent power to reconsider and modify an interlocutory order any time prior to final judgment." *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 923 n.3 (8th Cir. 2015). Unlike motions under Rules 59(e) or 60(b), a Rule 54(b) motion does not face the high bar of finality; it is addressed to the Court's sound discretion to correct error before it hardens into final judgment. *See Jones v. Casey's Gen. Stores*, 551 F. Supp.2d 848, 854 (S.D. Iowa 2008) (noting a court may reconsider any ruling under Rule 54(b) "to correct any clearly or manifestly erroneous findings of facts or conclusions of law").

The existence of discretion is not a license for endless re-argument. The threat of reconsideration "overuse" has not materialized in this case: this is the first reconsideration request by any party. Courts *should* revisit a prior ruling where failing to do so would work a "manifest injustice." *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir. 1988); *Evans v. Contract Callers, Inc.*, 2012 WL 234653, at *2 (E.D. Mo. Jan. 25, 2012) (reconsideration warranted if the initial decision was clearly erroneous and would work a manifest injustice). The Court's prior ruling was made on the record as it then existed, but the record has changed. Defendant Bradshaw was criminally charged, and there was no deadline there for the suppression motion now on file. Defendant Bradshaw's deeper exploration of *Garrity* (through a now-filed suppression motion and accompanying evidence) brought to light facts and context not squarely before this Court earlier.

Respectfully, the record now contains grounds to argue *clear error*–namely, the conclusion (urged by Plaintiffs at the time) that the Moving Defendants would not suffer true

9

prejudice in proceeding with civil discovery despite the pending criminal matters. That conclusion is not sustainable in light of *Garrity* and the new information now before the Court. If the case proceeds without a stay, the Moving Defendants will be forced either to invoke the Fifth Amendment in discovery (and thereby suffer adverse inferences and reputational damage in this civil rights trial) or to answer questions and litigate under the shadow that their own compelled statements might be used against them. This is exactly the no-win scenario *Garrity* deems intolerable. It would be a *manifest injustice* to march these Defendants down that path when the law provides a shield for them. Conversely, granting a modest stay (the Moving Defendants have requested 90 days, or such other period the Court deems proper) imposes minimal prejudice on Plaintiffs while upholding fundamental constitutional protections.

The Eighth Circuit has upheld reconsideration in analogous situations. In *Hoover v. Valley West DM*, the court affirmed relief from a prior ruling where new developments revealed the earlier decision would work an injustice. 823 F.2d 227, 230 (8th Cir. 1987). In *Julianello*, the Eighth Circuit acknowledged that while reconsideration motions must be used sparingly, they remain an important tool to rectify clear errors in interlocutory orders. 791 F.3d at 923 & n.3.

## **CONCLUSION**

"Justice," it has been aptly said, "is truth in action." (Joseph Joubert) Plaintiffs' selective invocation of constitutional principles undermines the very fairness and integrity they claim to champion. The truth now before this Court is that the Moving Defendants were compelled to give statements under threat of losing their jobs. Ignoring that truth would visit injustice upon them in this civil action–forcing them into an untenable choice that the Fifth Amendment squarely forbids. The Moving Defendants are asking only that the Court prevent their coerced statements from being used as a cudgel against them, directly or indirectly, in this case. The first

step toward that end is to stay these proceedings briefly, allowing the related criminal process to address the issue and avoiding inconsistent outcomes. The additional delay is minor; the protection of constitutional rights is paramount.

Respectfully submitted,

/s/ Bryce Tobin
Bryce Tobin, #75858
ANDREW BAILEY Attorney General
615 E. 13th Street, Suite 401
Kansas City, MO 64106
Telephone: (816) 889-3090
Bryce.tobin@ago.mo.gov
**ATTORNEY FOR DEFENDANTS CASE AND LEGGINS**

**AND**

**BATY OTTO SCHEER P.C.**

/s/ Jennifer Donnelli

| Theresa A. Otto | MO #43453 |
| Jennifer Donnelli | MO #47755 |
| Stephanie M. Burton | MO #63458 |

4435 Main Street, Suite 1100
Kansas City, MO 64111
Telephone: (816) 531-7200
Facsimile: (816) 531-7201
totto@batyotto.com
jdonnelli@batyotto.com
sburton@batyotto.com
**ATTORNEYS FOR DEFENDANT BRYANNE M. BRADSHAW**

11

**CERTIFICATE OF SERVICE**

      This certifies the foregoing was filed with the Court via the Court's e-filing system on May 29, 2025, with copies the same day via electronic mail to:

Andrew M. Stroth (admitted Pro Hac Vice)
ACTION INJURY LAW GROUP
22 W. Washington Street, #1600
Chicago, IL 60602
Telephone: (844) 878-4529
astroth@actioninjurylawgroup.com

Steven Hart (admitted Pro Hac Vice)
James Ormond (admitted Pro Hac Vice)
HART MCLAUGHLIN & ELDRIDGE, LLC
22 W. Washington Street, #1600
Chicago, IL 60602
Telephone: (312) 955-0545
shart@hmelegal.com
jormond@hmelegal.com

Larry Disparti (admitted Pro Hac Vice)
DISPARTI LAW, LLC
121 W. Wacker Drive, Suite 2300
Chicago, IL 60601
Telephone: (312) 506-5511
ldisparti@dispartilaw.com

Ben Stelter-Embry MO #65404
EMBRY LAW, LLC
4700 Belleview, Suite 300
Kansas City, MO 64112
Telephone: (913) 231-9396
ben@embry-law.com

**Attorneys for Plaintiffs**

Dennis S. Harms, #58937
Edna Besic, #76991
SANDBERG PHOENIX & von GONTARD P.C.
701 Market Street, Suite 600
St. Louis, MO 63101-1826
Telephone: (314) 231-3332
Facsimile: (314) 241-7604
dharms@sandbergphoenix.com
ebesic@sandbergphoenix.com
**Attorneys for Defendant Jennifer Long**

J. Thaddeus Eckenrode, #31080
ECKENRODE-BAUMAN
11477 Olde Cabin Rd., Suite 110
St. Louis, MO 63141
Telephone: (314) 726-6670
Facsimile: (314) 726-2106
jte@eckenrode-law.com
**Attorneys for Defendant**
**Centurion of Missouri, LLC**

Scott R. Pool, #42484
Joseph P. Bjork
GIBBS POOL AND TURNER, P.C.
3225 A Emerald Lane
Jefferson City, MO 65109
Telephone: (573) 636-2614
Facsimile: (573) 636-6541
pool@gptlaw.net
jbjork@gptlaw.net
**Attorneys for Defendants Davison, Williams,**
**Wells, Glatczak, Nkwocha and Kopp**

Ryan Bertels, #55167
SCHREIMANN, RACKERS & FRANCKA, L.L.C.
931 Wildwood Drive, Suite 201
Jefferson City, MO 65109
Telephone: (573) 634-7580
Facsimile: (573) 635-6034
rb@srfblaw.com
**Attorneys for Defendants Brown and Varner**

Kevin M. Smith, #51599
ANDREW BAILEY Attorney General
Deputy Chief Counsel – Litigation
615 E. 13th Street, Suite 401
Kansas City, MO 64106
Telephone: (816) 889-5106
Kevin.smith@ago.mo.gov
**Attorneys for Defendants Foley and Morriss**

      */s/ Jennifer Donnelli*
      **Attorney for Defendant**