# Cole County Sheriff's Office
### FIELD REPORT SUPPLEMENT
CASE# 2023-00021584

## ADDITIONAL SUBJECTS

**SUBJECT**

| Field | Value |
|---|---|
| JACKET/SUBJECT TYPE | Adult    Witness |
| NAME (LAST, FIRST, MIDDLE SUFFIX) | Falkenrath, Doris E |
| DOB | 12/12/1968 |
| AGE or AGE RANGE | 55 |
| ADDRESS (STREET, CITY, STATE, ZIP) | 4056 Southampton DR JEFFERSON CITY, MO 65109 |
| RACE | Black or African American |
| SEX | Female |
| HEIGHT or RANGE | |
| WEIGHT or RANGE | |
| HAIR | |
| EYE | |
| DL NUMBER/STATE | |
| PRIMARY PHONE | |
| PHONE #2 | |
| PHONE #3 | |

(Subjects 2–5: blank)

REPORTING OFFICER: SO10 Henson
DATE: 02/01/2024
REVIEWED BY:

**EXHIBIT B**

Case 2:24-cv-04107-MDH    Document 129-2    Filed 05/29/25    Page 1 of 6
CCSO Case Supp 2023-00021584-15_15_08 Page 1 OF 6

Nature of Case: Death Investigation
Report Number: 23-21584 Supp. #24
Det. Cpl. Greg Henson SO64

Source of Activity:

On 1-8-23 Doris E. Falkenrath came to the CCSD to speak with me referencing the Othel Moore Jr. death investigation. Falkenrath is the warden at JCCC.

Observations/Narrative:

Before my interview with Falkenrath began, I read her Miranda Rights to her. After acknowledging that she understood her rights, she signed the waiver form and began speaking to me. I will attach the form she signed to this supplement I turn in.

As the interview began it was established that Falkenrath was not at JCCC on 12-8-23 when the incident with Moore occurred. I began by asking Falkenrath when she was first notified that there was an incident with a use of force on an offender. She told me she thought it was around 9:00 AM by Deputy Warden Craig Crane. Falkenrath said when she was first notified, she was also told that the offender had died. I asked if at that time she was made aware of any details surrounding his death; she said no. She told me that Deputy Warden Crane told her there was an incident at the jail and the offender died. Falkenrath tells me she asked Crane what happened, and was told until he gets more details himself, he couldn't say.

I explain to Falkenrath that when the original call came out to dispatch, EMS was requested and sent to JCCC. I go on to say that in the recent past we have been turned away at the door and told law enforcement wasn't needed. Based on that a call was made from the CCSD to dispatch, asking that they contact JCCC and make sure they are requesting us there. I go on by saying that dispatch called us back and said JCCC does not or is not requesting law enforcement. I said it was around an hour later though we are called and told now we are needed at JCCC. I asked Falkenrath if she knows who called us off the first time when EMS was dispatched; she said she did not. She also tells me she didn't know anything about us originally being told we were not needed, she said this was the first-time hearing this.

I then talk to her about the confusion about who is going to be doing the conveyance of the body. I explained that I realize they have a contract with a different service than we use, but it can, and did create an issue. I then explain to Falkenrath how we were not notified of the time for the autopsy, and because of this we were never notified and missed the autopsy. I asked her if she was aware

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| SO10 Henson | 02/01/2024 | |

## NARRATIVE (continuation)

that this happened. Falkenrath tells me she had no idea that happened. She also asks me if we have our own provider to transport a body for an autopsy; I tell her yes. Falkenrath says she wasn't aware we had our own service we used. Falkenrath tells me that now that it's been explained to her, she understands why we would want to use our own conveyance service.

I next asked Falkenrath if she has seen the videos of the incident; she says yes, she has. She tells me she has watched the video from the top tier when Moore was removed from the cell. She says she has also watched the video of Moore being placed in the wrap and cart. Finally, Falkenrath says she watched the video from the dry cell as well. I ask Falkenrath to correct me if I'm wrong, and spoke about the policies for DOC. I said I am told that there is a blanket policy for DOC that covers all of the prisons, however each institution has some policies specific to just them. Falkenrath says that's correct, and adds not just policies but also SOP's. I asked her how familiar she was on the use of force policy for JCCC. According to Falkenrath, she considers herself |pretty familiar| with them. I asked her again if she watched the video; she says yes. I then ask her what the JCCC policy on pepper spraying someone when they are handcuffed behind their back. There is a noticeable pause before she begins her answer. She tells me that on the use of force continuum, if there is no threat present, then there would not be a need to use pepper spray. I asked her if after she watched the video, was Moore a threat to staff at that time; she said no. I clarified by asking if Moore was handcuffed behind his back and had multiple CERT members around him; she said correct.

I now ask her if she is aware that most of the people directly involved with the initial spray of Moore were no JCCC employees; she said yes. We also agreed that it's common for CERT members to travel between prisons when a large operation is happening. Falkenrath says she was aware there was a CERT operation for that morning, even though she was not on site. I asked her if medical was advised of the upcoming operation; she tells me no. She explains that they normally have nurses assigned to segregation units when there is enough medical staff, but adds they haven't had them in a long time though. She continues by saying that they have medical people on site 24/7 though.

I asked her if she talked to any of the CERT members, and am told she talked to Justin Davison and Ryan Williams. I tell Falkenrath that after speaking to other CERT members, it's my understanding that when a use of force is used on an offender, they have to be taken and placed on a bench. Falkenrath tells me that the place an offender on the bench if they are out of control or not in control of their actions. She says they don't just arbitrarily put every person on a bench following a use of force. After she said that, I asked if it looked to her like Moore was out of control or fighting. Falkenrath replies by saying, |I did not see any signs of a struggle.|

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| SO10 Henson | 02/01/2024 | |

## NARRATIVE (continuation)

I now explain that after the initial spraying, he was being escorted down the tier towards the steps. This from what I was told is so he could be placed on a bench. I said he was taken to the ground before reaching the steps, and sprayed a second time. I let her know that Lt. Tallent, a CERT team member and team leader from JCCC told me that he doesn't know why Moore was sprayed again, and he shouldn't have been sprayed again. Warden Falkenrath shakes her head up and down in agreement and in a soft voice says, |yeah.|

I asked Falkenrath if she would be surprised if I told her that witnesses said Moore was saying he couldn't breathe, and that he had asthma. She says she has heard people say those statements were made. She said she asked the field commanders if they heard Moore say that. Falkenrath said Davison told her he didn't hear that said. I let Falkenrath know that the people from Potosi are the people who said they heard him saying it. I asked her next to tell me what the policy is for when someone is pepper sprayed. I asked when they are checked on by medical and the pepper spray removed. She tells me they have to be provided with a water source, and medical definitely has to be notified. I ask her within what timeframe from when they are sprayed.; she says she doesn't know. Falkenrath tells me their policies are pretty vague and she doesn't want to tell me an answer that may be wrong. She does say that does not believe there is a timeframe mentioned in the policy.

Next topic I brought up was the wrap. Before I got to the wrap, I let her know that after being sprayed 2 times and possibly yelling that he couldn't breathe, he had a spit mask put over his head. I tell her that nobody claimed he spit at them, but rather he may have been spitting to try and get the pepper spray out of his mouth. I asked the warden who decides who gets placed in a wrap; Falkenrath tells me that would be the shift commander. I asked who the shift commander was for this. She tells me she isn't sure but it would either be a Captain or Lieutenant for that wing. I tell her that is another discrepancy in what I've been told. I tell her that I was told in previous interviews it would have to be approved by the CERT commander. Falkenrath tells me that doesn't make any sense to her. She says the CERT commander may not have been trained to use the wrap. She tells me again in a positive voice that it's the shift commander's call. I asked her who the shift commander would have been. She tells me she doesn't know, but says she can find out.

At this point I stepped out of the room briefly before returning. Upon returning, Falkenrath tells me they had a Captain's meeting that day so it may have been a Lieutenant as the acting shift commander. She narrows it down to Lt. Williams, Lt. Davison, and a third person named Lt. Arness (or something that sounded like that) I told her that Moore went from being sprayed a second time and brought down the stairs to going immediately into the wrap. She agreed and said, she doesn't believe they would have got on the phone and called someone for permission to put him in the wrap. I then ask who makes the decision on when someone is removed from the wrap. She tells

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| SO10 Henson | 02/01/2024 | |

me it is in two-hour intervals. If the offender is still combative after two hours, then she said she is to be called and he could be left in the wrap and check on in another two hours. Additionally, she said she had to be called before the offender is to be removed from the wrap. I asked how often the cart is used. Falkenrath tells me it's used all the time. She says they can use just the wrap without the cart, but they are usually used together.

I asked Falkenrath to think back to when myself and two other Detectives arrived at the prison to interview offenders who were in the area, and she turned us away until she spoke to legal. She told me she remembers that happening. I asked what her thought process was behind doing that. Falkenrath tells me that typically the prison doesn't give an outside agency any policies, equipment, or talk to any offenders without her having authorization from legal, and her zone director. Falkenrath tells me there are specific policies that say she is not allowed to disseminate any of their policies without approval. I asked if that policy says law enforcement conducting a criminal investigation? She tells me no, and then adds it just says they are restricted, or prohibited. I asked the warden if she could see how that could look really bad and the perception isn't goo. I told her we are investigating a possible major crime and refused access to people we need to interview.; she didn't verbally answer that question, but did shake her head up and down in an affirmative manner. Falkenrath then tells me that as soon as we were told to leave the prison, she called Earl Dye to ask for guidance. She told him what we were requesting, and according to Falkenrath, he told her we were supposed to be investigating the incident together. She said he told her there was an aspect we were supposed to be looking into, and a part Professional Standards was supposed to investigate. She said it was never made clear to her who was supposed to investigate what. I asked Falkenrath if she remembered a conversation with earl Dye about the CCSD having the wrap, the cart, and copies of their procedures. I said do you remember that conversation and asking him to call and try to get those items back. She told me that never happened. She said there was a conversation with Dye, in which she told him that we were in possession of those items, and asked him if that was okay. According to Falkenrath, Dye told her he was already working it out with legal. I asked her if she is telling me she never specifically asked Dye to see if he could get those items back; she said no, and added she thought that was Major Graham.

I tell Falkenrath I had one last question for her. I asked if she ever put out an email about what actions should be taken if anyone is heard speaking about the incident. I said we were told the IOC said if an offender is heard talking about Moore's death, they are to be segregated from everyone else, and staff is not to be discussing the incident. Falkenrath acknowledged she did put out an email about safety concerns. She said there were a lot of rumors floating around the prison, and she was afraid that offenders may see this as an opportunity to incite or rile up other offenders based on nothing more than rumors. Falkenrath said she never directed that any offender heard

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| SO10 Henson | 02/01/2024 | |

### NARRATIVE (continuation)

talking about the incident be separated from other. She said she only asked that if staff hears an offender discussing the incident to ask him to stop. I asked her if she would be fine with giving the CCSD that email; she said that was fine. (FYI Warden Falkenrath sent that email to the CCSD the following day)

This concluded my interview with Warden Falkenrath and she left the room.

Arrest/OCN#:

N/A

Evidence:

DVD of interview with Warden Doris Falkenrath on 1-8-24

Additional Information:

See all other supplements for any additional information

Report Submitted By:
Det. Cpl. Greg Henson SO64
Cole County Sheriff's Department

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| **SO10 Henson** | **02/01/2024** | |